UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RICMIC, LLC, a California limited liability company,<br><br>Plaintiff,<br><br>v.<br><br>SALIENT NETWORKS, INC., a California corporation,<br><br>Defendant. | Case No.: 20-CV-2015-CAB-MDD<br><br>**ORDER ON DEFENDANT'S MOTION TO DISMISS THE COMPLAINT UNDER FEDERAL RULE OF CIVIL PROCEDURE 12(B)(6) AND 35 U.S.C. § 101**<br><br>[Doc. No. 7] |

Before the Court is the motion to dismiss the complaint filed by Defendant Salient Networks, Inc. [Doc. No. 7.] Salient argues that United States Patent Nos. 9,305,450 B2 ("the '450 Patent") and 10,380,873 B1 ("the '873 Patent") (together, the "Asserted Patents"), which Plaintiff RICMIC, LLC asserts against Salient, are invalid because they are not directed to patentable subject matter under 35 U.S.C. §101. RICMIC opposed the motion. [Doc. No. 12.] For the reasons set forth below, the motion is denied.

## I. Background

The asserted patents are both titled "Interactive Wireless Life Safety Communications System." [Doc. No. 1-2 at 3, 26.][1] The '873 patent (issued August 13, 2019) is a continuation of the '450 patent (issued April 5, 2016), and they are each a continuation of patent application Ser. No. 13/611,426, filed on September 12, 2012 and now abandoned.[2] [Doc. No. 1 at 4-5.] The common specification discloses a wireless communication system in an assisted care facility to coordinate caregiving staff responses to resident alert events. The described system is designed to generate and transmit alarm signals from a resident's life safety device across a first communications network to a central coordination server, then alert a caregiver's device to the alarm and transmit the caregiver's response (the "action status response") back to the central coordination server via a second communications network.[3] All caregiver devices connected to the second communications network are updated with the action status response. The resident's life safety device continues to generate an alarm signal and progressively escalate its status to all caregiver devices until the resident's device is manually cleared, stopped or reset. The specification also describes two methods for coordinating caregiver responses to alert events via the described system.

The '450 patent includes one independent system claim (claim 1) with nine dependent claims (claims 2-10), and the '873 patent includes two independent system claims (claims 1 and 14) with twelve dependent claims (claims 2-13). [Doc. No. 1-2 at 21-22 (Col. 12:29-13:46), 45-47 (Col. 12:49-15:2).] The remaining independent claims of the asserted patents (claims 11 and 14 of the '450 patent and claim 15 of the '873 patent) recite

---

[1] Page cites to docket references are to the CM/ECF assigned page numbers.
[2] RICMIC contends that both asserted patents claim a priority date of September 12, 2012 for purposes of this analysis. [Doc. No. 12 at 4.]
[3] The portions of the common specification discussed herein are referenced to the column and line locations in the '450 patent. [Doc. No. 1-2 at 16-17, Col. 2:52-3:61.]

method claims directed to "coordinating caregiver responses to alert events in an assisted care facility." [*Id.* at 22-23 (Col. 13:47-15:27), 47 (Col. 15:3-16:35).]

Claim 1 of the '450 patent is representative of the three system claims in the asserted patents.[4] It reads:

> 1.  An interactive wireless life safety communications system comprising:
> a first communications network;
> a central coordination server linked to the first communications network;
> at least one resident life safety device associated with one of a specific location within an assisted care facility and a specific resident thereof, the resident life safety device being connected to the central coordination server over the first communications network with an alarm signal generated upon detection of an alarm condition being transmitted to the central coordination server;
> a second communications network different from the first communications network and linked to the central coordination server; and
> at least one caregiver communications device associated with a specific caregiver identity and connected to the central coordination server over the second communications network, the caregiver communications device being receptive to an alarm notification generated by the central coordination server and receptive to a caregiver user input, an action status response representative of an indication to other caregivers that the specific caregiver originating the action status response is one of: acknowledgement of the alarm and responding to the alarm condition, acknowledgement of the alarm and being unable to respond to the alarm condition, and lack of acknowledgement of the alarm and not yet responding to the alarm condition being generated from the user input for transmission to the central coordination server over the second communications network, all caregiver communications devices associated with the second communications network being automatically updated based upon the action status response;
> wherein resetting of the resident life safety device to stop the alarm signal is independent of the action status response, the first communications network, and the second communications network, and the alarm signal is continually generated with a progressive status escalation being

---

[4] See *Cellspin Soft, Inc. v. Fitbit, Inc.*, 927 F.3d 1306, 1318 n.4 (Fed. Cir. 2019) ("Given the similarities between the asserted claims, our eligibility analysis applies equally to all claims asserted across all four patents.").

communicated automatically to all caregiver communications devices until the resident life safety device is cleared, stopped or reset.

[Doc. No. 1-2 at 21-22 (Col. 12:29-13:3).]  The asserted dependent claims add these limitations:

> 2. The system of claim 1, wherein the alarm notification to the caregiver communications device is generated in response to the alarm signal.
> 3. The system of claim 1, wherein the alarm notification includes a one of a resident identifier, a graphical representation of a resident associated with the resident identifier, a location identifier corresponding to the one of the resident life safety devices from which the alarm signal was generated, and an alarm condition identifier corresponding to the one of the resident life safety devices from which the alarm signal was generated.
> 4. The system of claim 1, wherein a first one of the caregiver communications devices is linkable to a second one of the caregiver communications devices over the second communications network, voice communications being exchangeable between the first and second one of the caregiver communications devices independently of the central coordination server.
> 5. The system of claim 1, wherein: the first communications network is a hard-wired link; and the second communications network is wireless.
> 6. The system of claim 1, further comprising:
>    a private branch exchange communications module connected to the central coordination server, and linked to a telephone network;
>    wherein the caregiver communications device initiates a telephone call over the second communications network by accessing the private branch exchange communications module.
> 7. The system of claim 1, wherein the user input corresponds to an activation of a graphical user interface element displayed on the caregiver communications device.
> 8. The system of claim 1, wherein the user input corresponds to audio information received on the caregiver communications device.
> 9. The system of claim 1, wherein the user input corresponds to text information received on the caregiver communications device.
> 10. The system of claim 1, wherein one of the resident life safety devices is one of a wireless pull cord, a wireless pendant, a wireless motion detector, a door alarm, a window alarm, a fall detector, a smoke detector, and an incontinence detector.

[*Id.* at 22 (Col. 13:4-46).]

Claim 11 of the '450 patent is representative of the three method claims in the asserted patents. It reads:

> 11. A method for coordinating caregiver responses to alert events in an assisted care facility, the method comprising the steps of:
> generating an alarm signal upon detection of the alert event by a resident life safety device associated with one of a specific location within the assisted care facility and a specific resident of the assisted care facility;
> transmitting the alarm signal from the resident life safety device to a central coordination server, the resident life safety device being connected to the central coordination server over a first communications network;
> generating an alarm notification on the central coordination server in response to a receipt of the alarm signal;
> transmitting the alarm notification to at least one caregiver communications device over a second communications network different from the first communications network;
> receiving a caregiver input on the caregiver communications device, the caregiver input corresponding to an action status response to the received alarm notification, the action status response being representative of an indication to other caregivers that the specific caregiver originating the action status response is one of: acknowledgement of the alarm and responding to the alarm condition, acknowledgement of the alarm and being unable to respond to the alarm condition, and lack of acknowledgement of the alarm and not yet responding to the alarm condition;
> transmitting the action status response to the central coordination server over the second communications network; and
> updating all caregiver communications devices associated with the second communications network based upon the action status response;
> wherein resetting of the resident life safety device to stop the alarm signal is independent of the action status response, the first communications network, and the second communications network, and the alarm signal is continually generated with a progressive status escalation being communicated to all caregiver communications devices until the resident life safety device is stopped, cleared, or reset.

[Doc. No. 1-2 at 22 (Col. 13:47-14:22).]

RICMIC asserts that this claimed system/method is an advancement over existing communication systems in assisted care facilities, which consist of one-way numeric or

alphanumeric pagers, two-way voice radio, and/or mobile telephones. Specifically, RICMIC states that the '450 patent: (1) solves the problem of not knowing which caregiver, if any, is responding to an alarm signal; (2) prevents "alarm fatigue" among caregivers and ensures attention to the alarm condition, thereby enhancing resident safety; (3) provides substantially more information to caregivers about resident safety conditions; (4) improves interactivity between alert events and caregiver responses; (5) improves interactivity between managers and caregiver staff; (6) avoids technological issues presented by prior art systems (i.e., interference with life-critical equipment, unreliable network coverage, limited audio fidelity, disruptive volume levels, and other delays); and (7) avoids wasting personnel resources by multiple staff needlessly responding to alarm signals. [Doc. No. 12 at 21-22; Doc. No. 12-1 at 16 (Col. 1:60-2:59).] According to RICMIC, these problems are addressed by the patents through: (1) generating and transmitting the "action status response" to all caregiver devices to efficiently coordinate caregiver responses; (2) progressively escalating an alarm signal until the resident's life safety device is manually reset; (3) distributing real-time data on alarm conditions, resident identities, GPS locations, et cetera to caregivers via the central server; and (4) creating bi-directional communication channels with voice capability and an intuitive user interface across reliable wireless networks. [*Id.*] RICMIC also contends that the patents improve care facilities' administration by recording alert notifications in real time for later management review, and by providing a platform to perform various administrative functions (i.e., staff check-ins, time keeping, submission of maintenance requests and meal requests, and scheduling services). [Doc. No. 12 at 22.]

Salient argues that the claims of these continuation patents are directed at an abstraction: the "abstract idea of coordinating caregiver responses to alerts." [Doc. No. 7-1 at 11.] Further, according to Salient: (1) the asserted claims' concept "can readily be categorized as a method of organizing human activity," which is an abstract idea [*Id.* at 15-16]; (2) the asserted claims do not offer any meaningful limitations to that abstract idea, as they recite "routine, well-known, and conventional concepts" [*Id.* at 17]; and (3) the

asserted claims do not disclose any new or improved system or method of coordinating caregiver responses, but rather use generic computer components to automate and make more efficient existing systems and methods in conventional ways.  [*Id.* at 19.]

## II. Requests for Judicial Notice

In support of its motion to dismiss, Salient requests that the Court take judicial notice of various documents from the U.S. Patent and Trademark Office's ("USPTO") file history for the '450 patent.  [Doc. No. 7-2.]  In support of its opposition to Salient's motion, RICMIC also requests that the Court take judicial notice of two documents from the '450 patent's file history.  [Doc. No. 12-2.]

Under Federal Rule of Evidence 201, a court may take judicial notice, either on its own accord or by a party's request, of facts that are not subject to reasonable dispute because they are (1) "generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  FED. R. EVID. 201.  "Judicial notice is appropriate for records and reports of administrative bodies."  *United States v. 14.02 Acres of Land More or Less in Fresno Cty.*, 547 F.3d 943, 955 (9th Cir. 2008) (internal citations omitted).  This includes records issued by the USPTO, such as a patent's prosecution history.  *See Wi-LAN Inc. v. LG Elecs., Inc.*, 382 F. Supp. 3d 1012, 1027-28 (S.D. Cal. 2019) (collecting supporting cases).  Accordingly, the Court **GRANTS** both Salient's [Doc. No. 7-2] and RICMIC's [Doc. No. 12-2] requests and takes judicial notice of the '450 patent's prosecution history.

## III. Legal Standard Under Rule 12(b)(6)

When a party's 12(b)(6) motion to dismiss for failure to state a claim challenges the eligibility of a patent, courts apply the same standard that applies to all 12(b)(6) motions.  *Aatrix Software, Inc. v. Green Shades Software, Inc.*, 890 F.3d 1354, 1357 (Fed. Cir. 2018) (en banc) (per curiam) ("If patent eligibility is challenged in a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), we must apply the well-settled Rule 12(b)(6) standard which is consistently applied in every area of law.").  That standard under Rule 12(b)(6) is a familiar one, and there is no need to address it at length here.  In short, "[t]o

survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

## IV. 35 U.S.C. § 101

Section 101 defines the subject matter eligible for patent protection as "any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof." 35 U.S.C. § 101. The Supreme Court has clarified that Section 101 "contains an important implicit exception: Laws of nature, natural phenomena, and abstract ideas are not patentable." *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2354 (2014); *see also Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 132 S. Ct. 1289, 1293 (2012) ("Phenomena of nature, though just discovered, mental processes, and abstract intellectual concepts are not patentable, as they are the basic tools of scientific and technological work.") (quoting *Gottschalk v. Benson*, 409 U.S. 63, 67 (1972)). However, "an invention is not rendered ineligible for patent simply because it involves an abstract concept." *Alice*, 134 S. Ct. at 2354. Rather, "applications of such concepts to a new and useful end . . . remain eligible for patent protection." *Id.* (internal quotations and brackets omitted). "Accordingly, in applying the § 101 exception, [the court] must distinguish between patents that claim the building blocks of human ingenuity and those that integrate the building blocks into something more, thereby transforming them into a patent-eligible invention." *Id.* (internal quotations, citations, and brackets omitted).

The analysis of whether a patent falls within the exceptions to Section 101 is a two-step process. In the first step, the Court must "determine whether the claims at issue are directed to a patent-ineligible concept." *Alice*, 134 S. Ct. at 2355. This step involves considering the claims in light of the specification and asking whether "their character as a whole is directed to excluded subject matter." *Internet Patents Corp. v. Active Network, Inc.*, 790 F.3d 1343, 1346 (Fed. Cir. 2015). In the context of computer-related technology, the Court asks whether the claims focus on a specific asserted improvement in computer capabilities or, instead, on a process that qualifies as an abstract idea for which computers

are invoked merely as a tool. *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1335-36, 1338 (Fed. Cir. 2016) (noting that "simply adding conventional computer components to well-known business practices" is not enough to survive the first step of the *Alice* inquiry).

At step two, if the claims are directed to a patent-ineligible concept, the Court must "consider the elements of each claim both individually and as an ordered combination to determine whether the additional elements transform the nature of the claim into a patent-eligible application." *Alice*, 134 S. Ct. at 2355. This second step is also known as "a search for an inventive concept—*i.e.*, an element or combination of elements that is sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the ineligible concept itself." *Id.* (internal quotations and brackets omitted).

Although novelty, obviousness and enablement under § 102, § 103 and § 112 are separate considerations from a § 101 analysis, certain questions relevant to those determinations overlap with the "search for an inventive concept." For example: Do the elements of the claim, individually or in combination, and viewed in the context of the specification, disclose and teach advancements to the technology to solve the identified problem? Or, do the claim elements merely use known procedures, or conventional steps, specified at a high level of generality? *See Market Track, LLC v. Efficient Collaborative Retail Marketing, LLC*, No. 14 C 4957, 2015 WL 3637740, *5 (N.D. Ill. June 12, 2015), citing *Content Extraction & Transmission, LLC v. Wells Fargo Bank, Nat'l. Ass'n,* 776 F.3d 1343, 1347-48 (Fed. Cir. 2014) (discounting "well-known" or long-practiced procedures and finding no "inventive concept" in claims that "merely recite the use of [] existing . . . technology").

V. Analysis

A. Abstract Ideas

Salient argues that the claims at issue here are invalid under Section 101 because they focus on a patent-ineligible abstract idea of "coordinating caregiver responses to alerts." [Doc. No. 7-1 at 11.] In determining whether the claims at issue are "directed to a patent-ineligible concept," *Alice*, 134 S. Ct. at 2355, the Court considers whether the

claims' "character as a whole is directed to excluded subject matter." *Enfish*, 822 F.3d at 1335 (internal citations omitted); *see Genetic Techs. Ltd. v. Merial L.L.C.*, 818 F.3d 1369, 1375 (Fed. Cir. 2016) (inquiring into "the focus of the claimed advance over the prior art"). In the context of computer-implemented patents, those directed to an abstract idea "generally lack steps or limitations specific to the solution of a problem, or improvement in the functioning of technology," whereas those that are patent eligible are "directed to a specific improvement to the way computers operate." *Trading Techs. Int'l, Inc. v. CQG, Inc.*, 675 F.App'x 1001, 1002 (Fed. Cir. 2017).

In analyzing the eligibility of the asserted patents within the confines of a 12(b)(6) motion, and therefore only considering the factual allegations of the complaint, the asserted patents, and the '450 patent's prosecution history, the Court finds that RICMIC has adequately alleged that the asserted claims are patent eligible. *See Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1126-27 (Fed. Cir. 2018) ("[P]atentees who adequately allege their claims contain inventive concepts survive a § 101 eligibility analysis under Rule 12(b)(6)."). RICMIC contends that its asserted system/method claims present an improvement over the functioning of prior art systems (i.e., pager, radio, and cellphone systems) used in assisted care facilities. Specifically, RICMIC asserts that its system/method solves various problems arising with the prior art systems by automatically updating all caregiver devices with the responding caregiver's "action status response," by providing substantially more information regarding alert events, and by requiring that the resident life safety device be manually and independently reset to stop the alarm signal. [Doc. No. 12 at 21-22; Doc. No. 12-1 at 16 (Col. 1:60-2:59).]

Further, the USPTO prosecution history reveals that the examiner concluded the '450 patent's system/method was an improvement to the functioning of existing wireless life safety communication systems. After various communications, rejections, and amendments between the USPTO and the patentee [Doc. Nos. 7-3, 7-4, 7-5, 7-6; Doc. No. 12-1 at 58-69], the patent examiner allowed the claims as non-obvious over various prior art systems that disclosed all of the '450 patent's components but not in the specific

combination claimed. [Doc. No. 12-1 at 48-56.] When issuing the notice of allowance for the '450 patent, the patent examiner noted that the "prior art neither teaches nor suggests the interactive wireless life safety communications system/method" described in the patent's independent claims and limitations. [*Id.* at 54.] The examiner also stated that the specific limitations of the claimed invention "in conjunction with one another . . . would not have been obvious to a person of ordinary skill in the art at the time of the invention." [Doc. No. 12-1 at 55.] This record supports RICMIC's contention that its asserted system/method claims are an advancement over the prior art systems.

In sum, because RICMIC alleges that the asserted patents are directed toward specific improvements in assisted care facilities' communications systems that make those systems more efficient and useful, the Court concludes that the patents, as pleaded, are not directed to an abstract idea. Accordingly, RICMIC's allegations are sufficient to plead eligible patents under section 101.

### B. Inventive Concept

Because the asserted claims are not directed to an abstract idea under step one of the *Alice* analysis, the Court need not proceed to step two of that analysis. *Enfish*, 822 F.3d at 1339. Nevertheless, even if the claims were directed to an abstract idea, the Court would still find the claims to be patent-eligible under step two of the *Alice* framework.

In *Alice*'s second step, the court must "examine the elements of the claim to determine whether it contains an inventive concept sufficient to transform the claimed abstract idea into a patent-eligible application." *Alice*, 134 S. Ct. at 2357 (internal quotations omitted). If a claim's "only inventive concept is the application of an abstract idea using conventional and well-understood techniques, the claim has not been transformed into a patent-eligible application of an abstract idea." *BSG Tech LLC v. Buyseasons, Inc.*, 899 F.3d 1281, 1290-91 (Fed. Cir. 2018). In the computer context, an abstract process could be directed to a patent-eligible subject if it discloses a specific improvement in computer performance designed to implement the process. *See McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1314 (Fed. Cir. 2016). However,

"the mere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent-eligible invention." *Alice*, 134 S. Ct. at 2358; *see also DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1256 (Fed. Cir. 2014) ("[A]fter *Alice*, there can remain no doubt: recitation of generic computer limitations does not make an otherwise ineligible claim patent-eligible.").

RICMIC emphasizes that the asserted patents solve a technology problem in assisted care facilities by improving the operation and functionality of those facilities' communications systems. RICMIC identifies the following claim elements as the purported advancements to the prior art systems: (1) the use of a first communications network connected to a central server, over which resident life safety devices send an alert signal when triggered; (2) the use of a second communications network, different from the first and connected to the same central server; (3) the use of caregiver devices that receive an alarm signal from the central server via the second network, and that transmit the caregiver's "action status response" back to the central server; (4) the use of an "action status response" to communicate whether a specific caregiver is acknowledging and responding to the alarm, acknowledging and unable to respond, or not acknowledging and not responding; (5) the ability to update all caregiver devices with the "action status response"; and (6) the requirement that the resident life safety device be manually and independently cleared, stopped or reset to stop an alarm signal, with the signal's status continually escalated to all caregiver devices until its reset. [Doc. No. 12 at 19-20.] RICMIC alleges that these limitations "provide bi-directional communication and the attendant interactivity that is a vast improvement over prior art systems, and provide the architecture and foundation for increased staff efficiencies." [*Id.* at 21.]

Accepting the allegations stated above as true, the Court cannot conclude that RICMIC's asserted claims lack an inventive concept. Rather, RICMIC's "plausible and specific factual allegations that aspects of the claimed invention" are an inventive improvement to the prior art are sufficient to defeat a motion to dismiss. *Cellspin Soft, Inc. v. Fitbit, Inc.*, 927 F.3d 1306, 1318 (Fed. Cir. 2019). The patent examiner's findings also

support RICMIC's allegations, as the USPTO found the additional features of the '450 patent not obvious to one of skill in the art and concluded that the claimed system/method was an inventive disclosure.  Further, Salient has not demonstrated by clear and convincing evidence that RICMIC's claimed system/method was a conventional, well-known and routine application of existing technology.  *See Berkheimer v. HP Inc.*, 881 F.3d 1360, 1368 (Fed. Cir. 2018) ("The question of whether a claim element or combination of elements is well-understood, routine and conventional to a skilled artisan in the relevant field is a question of fact.  Any fact, such as this one, that is pertinent to the invalidity conclusion must be proven by clear and convincing evidence.").  Accordingly, based on the limited record before it at this stage, the Court has no basis to conclude that the claimed system/method was well-known or conventional as a matter of law.  *See Cellspin*, 927 F.3d at 1318 ("[F]actual disputes about whether an aspect of the claims is inventive may preclude dismissal at the pleadings stage under § 101.").

## VI.  Conclusion

Having considered the submissions of the parties and the record before it, the Court cannot say that the asserted claims of U.S. Patent No. 9,305,450 B2 and US. Patent No. 10,380,873 B1 are ineligible under 35 U.S.C. §101 as a matter of law.  Salient's motion to dismiss the complaint is therefore **DENIED** without prejudice.  Salient is not precluded by this decision from raising the patentability of the asserted claims at a later date based on additional discovery and a more fulsome record.

It is **SO ORDERED**.

Dated:  April 7, 2021

Hon. Cathy Ann Bencivengo
United States District Judge